**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

Al Jamoua,

      Plaintiff,

 v.

Michigan Farm Bureau, d/b/a Farm Bureau Insurance, and Paul Wagner,

Jointly and Individually,

      Defendants.

Case No.

Hon.

---

**COMPLAINT FOR INJUNCTIVE RELIEF AND MONEY DAMAGES AND JURY DEMAND**

Plaintiff Al Jamoua ("Jamoua") complains of defendants Michigan Farm Bureau, d/b/a Farm Bureau Insurance ("Company"), and Paul Wagner ("Wagner"), as follows:

**PARTIES, JURISDICTION AND VENUE**

1.     Al Jamoua is a resident of West Bloomfield, Michigan.

2.     Farm Bureau Insurance is a Michigan domestic corporation with its principal offices in Lansing, Michigan.

3.     Paul Wagner is a resident of the Eastern District of Michigan.

1

4.      The key events in this matter occurred in the Eastern District of Michigan; therefore, venue is appropriate in this Court.

5.      This Court has subject matter jurisdiction over Plaintiff's claims under 42 U.S.C. §§ 1981, 1981a, and 1988 pursuant to 28 U.S.C. § 1331.

6.      This Court has supplemental jurisdiction over Plaintiff's state-law claims under 28 U.S.C. § 1367, as the facts related to these claims are the same as the federal-law claims.

## STATEMENT OF FACTS

7.      Al Jamoua is a 61-year-old naturalized American citizen who is of Chaldean ethnicity.

8.      Jamoua has been in the insurance industry working as an employee and agent since 2003.

9.      Since February of 2011, Jamoua has worked as an employee and operated an agency exclusively selling Farm Bureau Insurance products.

10.     According to the contract under which Jamoua sells Farm Bureau Insurance—including home-owner, renter, automobile, life, worker's compensation, commercial and other general business policies—he is an agent of Farm Bureau Insurance.

11.     As an employee and agent of the Company, Jamoua is required to sell only Farm Bureau Insurance products and he is prohibited from engaging in any other business activities.

12.     Prior to 2019, automobile insurance policies comprised approximately half the value of Jamoua's book of insurance business.

13.     Jamoua has focused his sales efforts on the Chaldean and Arab communities in and around the Detroit Metro Area.

14.     Jamoua has been successful in selling insurance products to the Chaldean and Arab communities because he is himself a Chaldean immigrant from Iraq, speaks Arabic and Chaldean, participates in the communities' cultural organizations, and enjoys established relationships in these communities.

15.     Paul Wagner is the associate manager for the southeast Michigan region of Farm Bureau Insurance, and in that role oversees the agents and agencies in his region, including Jamoua's agency.

16.     According to Farm Bureau's reports for the year ending December 31, 2017, Jamoua ranked as one of its highest producing agents in every category reported on. Of the 135 agents, Jamoua ranked:

      a.     18th in Life Premiums;

      b.     10th in number of Life Policies;

c.     24th in Annuity Premiums;

d.     2nd in number of Annuity Policies;

e.     47th in GL Premiums;

f.     33rd in number of GL Policies;

g.     21st in Auto Premiums;

h.     27th in number of Auto Policies;

i.     10th in Life Commissions;

j.     43rd in GL Commissions;

k.     20th in Auto Commissions;

l.     23rd in Annuity Commissions; and

m.     23rd in Total New Commissions.

17.     On or about December 12, 2017, Wagner held an annual face-to-face review meeting with Jamoua.

18.     At this meeting, Wagner instructed Jamoua to cease selling automobile insurance to his Chaldean and Arab customers.

19.     The Company was particularly concerned with the Personal Insurance Protection, or PIP, portion of these automobile insurance policies because they include expensive medical and loss-of-income claims.

20.     Wagner and the Company harbor stereotyped views of Chaldeans and Arabs, that they are poor insurance risks.

4

21.     Under the Michigan Insurance Code, M.C.L. § 500.2027(a)(i), it is unlawful to refuse to insurance, refuse to continue to insurance, or limit the amount of coverage to an individual because of race, color, creed, or national origin.

22.     The Company has not investigated any individual or specific clients of Jamoua's for purportedly high claims.

23.     Rather, the Company and Wagner relied only on unsubstantiated stereotypes and biases against all Chaldeans and Arabs to force Jamoua to cease selling new policies to Chaldeans and Arabs.

24.     Notwithstanding the plain prohibition in the Michigan Insurance Code against relying on unfair racial and ethnic stereotypes in the insurance business, Wagner asked Jamoua at this meeting who were the people in his book of business, clearly knowing that the answer was Chaldean and Arab people.

25.     Jamoua responded that his book of business was predominantly people of Chaldean and Arab ethnicities.

26.     Wagner responded to Jamoua, "try not to sell to the people from your culture."

27.    In directing Jamoua to refrain from selling to "the people from [his] culture," Wagner relied on unfair racial and ethnic stereotypes that Chaldean and Arab people are not good insurance risks.

28.    In 2017, Jamoua's customers were 85-90% of Jamoua's customers were members of the Chaldean and Arab communities.

29.    In 2017, Jamoua's book of business was worth approximately $2.5 million, which earned him approximately $300,000 in income from the Company.

30.    Jamoua pays his own salary, rent, payroll for staff, and all other agency expenses out of the income from the Company.

31.    Of this income, Jamoua's salary in 2017 was approximately $120,000.

32.    Starting in 2018, the Company refused to underwrite or provide timely coverage quotes to Jamoua for new customers and non-active customers seeking automobile insurance.

33.    Starting in 2018, the Company also began providing far higher automobile premium quotes for residents of Sterling Heights, where the majority of Jamoua's Chaldean and Arab customers live.

34.     It is common practice within the Company to delay in providing coverage or to increase the premiums on customers the Company no longer desires to cover so that they leave for a different insurance agency.

35.     Therefore, when the Company imposed very high rate increases or delayed in providing coverage on the residents of Sterling Heights, it was acting intentionally to discourage the Chaldean and Arab customers there from retaining or purchasing their automobile policies with Farm Bureau Insurance.

36.     Around this same time, another insurance agent of Chaldean ethnicity whose book of business was nearly entirely Chaldean immigrants was forced to leave the Company because the Company set a strict cap on the number of automobile policies he could sell and made it impossible for him to earn a living as an agent for Farm Bureau Insurance.

37.     Also around this time, an insurance agent of Eastern European Jewish ethnicity whose book of business is nearly entirely Jewish immigrants from Eastern Europe is similarly having his business and livelihood undermined by the Company imposing limits on him and asking him to diversify away from selling insurance to people of Eastern European Jewish ethnicity.

38.    After meeting on April 30, 2018 with the Company's managing partner, Tom Parker, Wagner and another manager no longer with the Company, Jamoua put in writing to them the immediate steps he was taking to reduce loss ratios at his agency.

39.    These steps by Jamoua included active efforts to increase insurance business with low-risk customers by adding multiple-policy products and expanding the marketing of his agency in Troy, Michigan.

40.    These steps by Jamoua also included imposing far more stringent approaches to evaluating new customers and weeding out high-risk customers and customers only insuring one car.

41.    Jamoua also reiterated at the meeting and in this written statement to Wagner and Parker that he would follow Wagner's dictate to "[t]ry to avoid insuring customers from our culture unless they are in good insurability position."

42.    Wagner had unconditionally directed Jamoua on December 12, 2017, to avoid selling any products to members of the Chaldean and Arab communities, but Jamoua insisted that he would continue to sell to all customers, regardless of their ethnic, cultural, religion, and national origin, as long as they met the qualifications for insurability.

43.     Jamoua projected that with these steps in place, his loss ratio by 2019 would be in line with other Farm Bureau agents.

44.     Wagner and Parker warned Jamoua that they would remove his agency if his losses kept going up.

45.     On June 27, 2018, the Company imposed a "re-underwriting program" to review Jamoua's entire book of auto policies, starting immediately in July of 2018.

46.     Although the Company claimed that its goal was to help Jamoua improve the profitability of his policies, in fact the "re-underwriting program" was intended to destroy Jamoua's book of policies and force him out of business.

47.     Notwithstanding Jamoua's immediate actions to address the loss ratios, the Company continued to cancel Jamoua's policies and thwart his ability to sell policies to new customers or service the needs of current customers.

48.     Jamoua had sold 130.5 new automobile insurance policies in 2017, and 111.5 new automobile insurance policies in 2018, but by October 31, 2019, Jamoua had been allowed to sell only 5 new policies.

49.     Jamoua's other product sales have also suffered as a result of the prohibition on automobile insurance sales, because customers often bundle their insurance policy purchases.

50.     Whereas Jamoua sold 43.5 new life insurance policies in 2017 and 35.5 new life insurance policies in 2018, by October 31, 2019, he had sold only 3.

51.     Jamoua had sold 151 general—that is, non-automobile and non-life policies—in 2017 and 135 in 2018, but had sold only 52 such policies through October 31, 2019.

52.     Between 2015 and 2018, automobile policies represented between 60% and 68% of Jamoua's business.

53.     As a result of the restrictions imposed on Jamoua by Defendants—specifically his inability to write the lucrative automobile policies for his Chaldean and Arab Customers, Jamoua fell in the agent rankings by the end of 2018 so that out of 131 agents in December 2018, Jamoua ranked:

> a.     34th in Life Premiums, down from 18th in 2017;
>
> b.     27th in number of Life Policies, down from 10th in 2017;
>
> c.     30th in Annuity Premiums ($650), down from 24th in 2017 ($2,190);

d.      28th in numbers of Annuity Policies, down from 2nd in 2017;

e.      60th in GL Premiums, down from 47th in 2017;

f.      51st in number of GL Policies, down from 33rd in 2017;

g.      27th in Auto Premiums, down from 21st in 2017;

h.      44th in number of Auto Policies, down from 27th in 2017;

i.      36th in Life Commissions, down from 10th in 2017;

j.      59th in GL Commissions, down from 43rd in 2017;

k.      25th in Auto Commissions, down from 20th in 2017;

l.      29th in Annuity Commissions, down from 23rd in 2017; and

m.      33rd in Total New Commissions, down from 23rd in 2017.

54.     On December 5, 2018, the Company informed Jamoua that he had the option of receiving a 5- or 10-year "payout" to leave the company or continue as an employee and agent for the Company, but without the ability to sell automobile policies.

55.     Jamoua rejected this proposal, because he could continue to support his family if he retired and he could not support his family without the ability to sell automobile policies.

56.     Jamoua understood that the insistence from his managers that he retire arose from his persistence to sell and serve his community, which included people of Chaldean and Arab ethnicity.

57.     In early 2019, Farm Bureau managers asked Jamoua to provide him with a retirement date so that they could finalize his retirement paperwork.

58.     Jamoua responded to this pressure by writing to his managers that he would "would like to retire a year early February 1, 2020 if I received a retirement plan that can help me and my family to survive when we move outside the State of Michigan."

59.     The Company indicated that it would not advise Jamoua of the amount of his payout until after he agreed to retire; however, Jamoua insisted that he would not agree to retire unless the amount the Company would provide him was sufficient for him.

60.     Since early 2019, Jamoua has not been advised of the amount the Company was prepared to offer him as a retirement payout; therefore, there has been no agreement between Jamoua and Farm Bureau regarding his retirement.

61.     Not able or willing to retire, Jamoua rejected this unspecified "payout" option, but was left unable to sell new automobile insurance policies in 2019.

62.     Meanwhile, the Company continued to cancel Jamoua's policies in 2019, even as he succeeded in reducing his loss ratio.

63.     During 2019, the Company further interfered with Jamoua's business by delaying renewals even for his most valuable and low-risk clients and for policies other than automobile insurance.

64.     By November of 2019, Jamoua's ranking among Farm Bureau agents had further declined through Farm Bureau's unlawful insistence that he not sell to individuals of Chaldean and Arab ethnicity, so that of the 125 agents in 2019, Jamoua ranked:

> a.      93rd in Life Premiums, down from 18th in 2017 and 34th in 2018;
>
> b.      93rd in number of Life Policies, down from 10th in 2017 and 27th in 2018;
>
> c.      29th (tied with 95 agents) in Annuity Premiums ($0), down from 24th ($2,190) in 2017 and $650 in 2018;
>
> d.      22nd (tied with 104 for 0) in number of Annuity Policies, down from 2nd in 2017 (3 policies) and 0 policies in 2018;

e.      104th in GL Premiums ($39,961), down from 47th in 2017 ($111,594) and 60th in 2018 ($103,352);

f.      98th in number of GL Policies (53), down from 33th in 2017 (151) and 51st in 2018 (135);

g.      102nd in Auto Premiums ($72,945), down from 21st in 2017 ($318,100) and 27th in 2018 ($321,687);

h.      120th in number of Auto Policies (5), down from 27th in 2017 (130.5) and 44th in 2018 (111.5);

i.      91st in Life Commissions ($1,694), down from 10th in 2017 ($15,143) and 36th in 2018 ($10,317);

j.      103rd in GL Commissions ($4,984), down from 43rd in 2017 ($14,501) and 59th in 2018 ($12,941);

k.      92nd in Auto Commissions ($6,883), down from 20th in 2017 ($30,272) and 25th in 2018 ($30,562);

l.      58th (tied with 98) in Annuity Commissions ($0), down from 23rd in 2017 ($66) and 29th in 2018 ($20); and

m.      102nd in Total New Commissions ($13,481), down from 23rd in 2017 ($59,981) and 33rd in 2018 ($53,838).

65.     Also during 2018 and 2019, the Company began to look the other way when other agents poached Jamoua's customers and supported non-Chaldean agents, regardless of the facts or merits, in disputes against Jamoua.

66.     As a result of the Company's actions to prohibit Jamoua from selling automobile insurance, along with other restrictions on his business efforts, Jamoua's book of business is now worth approximately $1.9 million, which is $500,000 less than in 2018.

67.     On April 23, 2019, Jamoua's agency staff wrote to the Farm Bureau Southeast manager, Danny Negin, seeking permission to write an automobile insurance policy to a new customer.

68.     Based on his experience and knowledge, Jamoua knew that this customer would have received an insurance quote if he had been presented by a non-Chaldean agent.

69.     Receiving no response, Jamoua called Negin, who informed him, "the company does not want to insure your customers" and suggested that he refer the customer to a former Farm Bureau agent of Chaldean ethnicity who had opened an independent brokerage.

70.     Jamoua understood Negin's comment and suggestion to mean that the Company was refusing to handle Jamoua's clients because they are of Chaldean and Arab ethnicity.

15

71.     Jamoua now finds himself in a dire financial situation because the Company's actions to thwart his business have slashed his income to a point where he cannot afford to sustain his employment as a Farm Bureau agent.

72.     As a result of the Company and Wagner's animus against the Chaldean and Arab communities, Jamoua has suffered extensive economic losses, lost future business opportunities, and experienced extreme pain, humiliation, emotional distress, and dignitary harm.

## COUNT I: VIOLATION OF 42 U.S.C. §§ 1981, 1981a

73.     Plaintiff incorporates the above allegations by reference here.

74.     42 U.S.C. § 1981 guarantees all persons within the United States the equal right to make and enforce contracts, regardless of race and ethnicity.

75.     Jamoua and Farm Bureau were in a contractual relationship regarding Jamoua's work as an insurance agent selling Farm Bureau Insurance policies.

76.     Wagner controlled essential aspects of Jamoua's business, including his ability to sell insurance policies, provide quotes to new and existing customers, and exercise his freedom to make contracts with customers, regardless of their race and ethnicity.

77.    Wagner explicitly informed Jamoua that his focus on Chaldean and Arab customers was not desirable to the Company and that Jamoua needed to stop selling policies to his Chaldean and Arab customers.

78.    The Company has also demonstrated a practice of thwarting the business of Chaldean insurance agents who, because of their language skills and ties to that community, are able to win the trust and business of customers who are also Chaldean.

79.    The Company has also demonstrated that it will similarly thwart the business of Eastern European Jewish agents who, because of their language and cultural ties to that community, are able to win the trust and business of customers who are also of Eastern European Jewish ethnicity.

80.    The Company imposed adverse conditions to the contracts for Jamoua's customers and delayed in servicing Jamoua's customers because he and his customers are Chaldean and Arab.

81.    Because of Wagner and Farm Bureau's bias against Chaldeans and Arabs like Jamoua and his customers, Jamoua has suffered economic damages from the loss of approximately half of his book of business.

82.    Wagner and the Company, motivated by a bias against Chaldeans and Arabs like Jamoua and his customers, have interrupted Jamoua's business

and thwarted his ability to propose and sell insurance policies to his Chaldean and Arab customers.

83.     Because of Wagner and Farm Bureau's bias against Chaldeans and Arabs like Jamoua and his customers, Jamoua has suffered severe emotional distress and humiliation.

84.     Wagner's bias against Chaldeans and Arabs is blatant, explicit, and unconscionable, as demonstrated by his directing Jamoua to cease selling policies "with your people from your culture."

85.     The Company and its managers demonstrate blatant, explicit, and unconscionable bias against Chaldeans and Arabs by denying them insurance through Al Jamoua, the agent of their choosing, and by raising premium rates in the town where they live to discourage their business.

## COUNT II: VIOLATION OF THE ELLIOTT-LARSEN CIVIL RIGHTS ACT, ARTICLE II

86.     Plaintiff incorporates by reference all of the allegations contained above as stated in full herein.

87.     The Elliott-Larsen Civil Rights Act, M.C.L. § 37.2202(1) ("ELCRA"), prohibits an employer from limiting, segregating, or classifying an employee or agent in a way that deprives him of an employment opportunity because of that individual's race or national origin.

18

88. Although labeled as an "agent," Jamoua at all relevant times served as an employee of the Company, exclusively selling and servicing Farm Bureau Insurance policies.

89. Wagner controlled essential aspects of Jamoua's employment, including his ability to sell insurance policies, provide quotes to new and existing customers, and act as an employee of the Company to sell insurance policies with customers, regardless of their race and ethnicity.

90. Wagner explicitly informed Jamoua that his focus on Chaldean and Arab customers ("your people") was not desirable to Farm Bureau and that Jamoua needed to stop selling policies to Chaldean and Arab customers.

91. The Company has also demonstrated a practice of thwarting the business of Chaldean insurance agents who, because of their language skills and ties to that community, are able to win the trust and business of customers who are also Chaldean.

92. The Company has also demonstrated that it will similarly thwart the business of Eastern European Jewish agents who, because of their language and cultural ties to that community, are able to win the trust and business of customers who are also of Eastern European Jewish ethnicity.

93.     The Company imposed adverse conditions on the contracts for Jamoua's customers and delayed in servicing Jamoua's customers because he and his customers are Chaldean and Arab.

94.     Because of Wagner and the Company's bias against Chaldeans and Arabs like Jamoua and his customers, Jamoua has suffered economic damages from the loss of approximately half of his book of business.

95.     Wagner and the Company, motivated by a bias against Chaldeans and Arabs like Jamoua and his customers, have interrupted Jamoua's employment and thwarted his ability to propose and sell insurance policies to his Chaldean and Arab customers.

96.     Because of Wagner and the Company's bias against Chaldeans and Arabs like Jamoua and his customers, Jamoua has suffered severe emotional distress and humiliation.

97.     Wagner's bias against Chaldeans and Arabs is blatant, explicit, and unconscionable, as demonstrated by his directing Jamoua to cease selling policies "with your people from your culture."

98.     The Company and its managers demonstrate blatant, explicit, and unconscionable bias against Chaldeans and Arabs by denying them insurance through Al Jamoua, the agent of their choosing, and by raising premium rates in the town where they live to discourage their business.

20

## COUNT III: VIOLATION OF THE ELLIOTT-LARSEN CIVIL RIGHTS ACT, ARTICLE III

99.   Plaintiff incorporates by reference all of the allegations contained above as stated in full herein.

100.  The ELCRA, M.C.L. §37.2301 broadly defines places of public accommodations to include insurance companies like Farm Bureua because they are businesses that offer or sell goods to the public.

101.  The ELCRA, M.C.L. §37.2302, makes it unlawful to "[d]eny an individual the full and equal enjoyment of the goods [and] services" because of, inter alia, religion, race, or national origin.

102.  Jamoua at all relevant times served as an employee and agent of Farm Bureau, selling and servicing Farm Bureau Insurance policies to his customers.

103.  Wagner and the Company controlled essential aspects of Jamoua's business by setting the premium pricing for its insurance policies and approving or disallowing the sale of policies to specific customers.

104.  Wagner and the Company exercised control over Jamoua's agency and business by determining whether he could sell enough policies for his agency to be economically viable.

105.   Wagner explicitly informed Jamoua that his focus on Chaldean and Arab customers ("your people") was not desirable to Farm Bureau and that Jamoua needed to stop selling policies to Chaldean and Arab customers.

106.   The Company has also demonstrated a practice of thwarting the business of Chaldean insurance agents who, because of their language skills and ties to that community, are able to win the trust and business of customers who are also Chaldean.

107.   The Company has also demonstrated that it will similarly thwart the business of Eastern European Jewish agents who, because of their language and cultural ties to that community, are able to win the trust and business of customers who are also of Eastern European Jewish ethnicity.

108.   Farm Bureau Insurance imposed adverse conditions on the contracts for Jamoua's customers and delayed in servicing Jamoua's customers because he and his customers are Chaldean and Arab.

109.   Because of Wagner and the Company's bias against Chaldeans and Arabs like Jamoua and his customers, Jamoua has suffered significant economic damages—namely, the loss of business.

110.   Wagner and the Company, motivated by a bias against Chaldeans and Arabs like Jamoua and his customers, have interrupted Jamoua's business

and thwarted his ability to propose and sell insurance policies to his Chaldean and Arab customers.

111.   Because of Wagner and the Company's bias against Chaldeans and Arabs like Jamoua and his customers, Jamoua has suffered severe emotional distress and humiliation.

112.   Wagner's bias against Chaldeans and Arabs is blatant, explicit, and unconscionable, as demonstrated by his directing Jamoua to cease selling policies "with your people from your culture."

113.   Farm Bureau and its managers demonstrate blatant, explicit, and unconscionable bias against Chaldeans and Arabs by denying them insurance through Al Jamoua, the agent of their choosing, and by raising premium rates in the town where they live to discourage their business.

## RELIEF SOUGHT

WHEREAS, Plaintiff has suffered significant economic damages and severe emotional distress with physical pain from Defendants' actions, he seeks the following relief available under 42 U.S.C. §§ 1981a and 1988 and/or under M.C.L. §§ 37.3801-02:

A.   Damages equivalent to all lost economic damages and compensation, both past and future, as well as the accrued

interest on same;

B.    Compensatory damages for the emotional distress, pain and suffering, and harm to reputation, caused by Wagner and the Company's racial and ethnic animus;

C.    Punitive damages for the willful, intentional discrimination by Defendants;

D.    Injunctive relief requiring Defendants to cease their discriminatory practices, restore Jamoua's book of business, and/or remove the non-compete restrictions on Jamoua should he leave Farm Bureau; and

E.    Reasonable attorney's fees, including costs; and

F.    Any further relief as the Court deems appropriate.

Respectfully submitted by:

Pitt McGehee Palmer Bonanni & Rivers, PC

By: /s/*Robin B. Wagner*
Michael L. Pitt P24429
Beth M. Rivers P33614
Robin B. Wagner P79408
117 W. Fourth Street, Suite 200
Royal Oak, MI 48067
248-398-9800
mpitt@pittlawpc.com
rwagner@pittlawpc.com

Dated: January 27, 2020    brivers@pittlawpc.com

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

Al Jamoua,

      Plaintiff,

 v.

Michigan Farm Bureau, d/b/a Farm Bureau Insurance, and Paul Wagner,

Jointly and Individually,

      Defendants.

Case No.

Hon.

**DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury of the facts and issues involved in this matter.

Pitt McGehee Palmer Bonanni & Rivers, PC

By: _/s/ Robin B. Wagner_____
Michael L. Pitt P24429
Beth M. Rivers P33614
Robin B. Wagner P79408
117 W. Fourth Street, Suite 200
Royal Oak, MI 48067
248-398-9800
mpitt@pittlawpc.com
brivers@pittlawpc.com
rwagner@pittlawpc.com

Dated: January 27, 2020

25