UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

AL JAMOUA,

     Plaintiff,

v.

MICHIGAN FARM BUREAU,
FARM BUREAU GENERAL
INSURANCE COMPANY OF
MICHIGAN,
FARM BUREAU LIFE INSURANCE
COMPANY OF MICHIGAN,
FARM BUREAU MUTUAL
INSURANCE COMPANY OF
MICHIGAN,
COMMUNITY SERVICE
ACCEPTANCE COMPANY,
PAUL WAGNER, and
DANNY NEGIN,

     Defendants.

Case No. 20-cv-10206
Honorable Laurie J. Michelson

---

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [31]

---

From 2011 until 2020, Al Jamoua worked as an insurance agent for Michigan Farm Bureau. Jamoua is Chaldean and most of his customers were Chaldean or Arab. Jamoua alleges that in late 2017, a Michigan Farm Bureau managing partner directed him not to sell insurance to people of "[his] culture." And, says Jamoua, in or around 2018, Michigan Farm Bureau set insurance rates high in areas of southeast Michigan that have a significant population of people with Middle Eastern ancestry. According to Jamoua, the managing partner's directive and the higher rates

hampered his ability to sell insurance in 2018 and 2019. So Jamoua filed this lawsuit against several, related Michigan Farm Bureau companies and two managing partners, alleging that they violated federal and state anti-discrimination laws.

The parties have completed discovery and the defendants seek summary judgment. Because a reasonable jury could find racial animus by defendants that caused Jamoua to sell fewer policies (which, in turn, decreased his income), the Court will largely deny the defendants' motion.

## I.

### A.

At the summary-judgment stage, the Court accepts as true Jamoua's version of the events. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

In 2011, Jamoua began working as an agent of Farm Bureau General Insurance Company of Michigan and several related Farm Bureau companies (collectively, "Michigan Farm Bureau"). (ECF No. 34-2, PageID.537.) Under his agent agreement, Jamoua was "authorized to solicit applications on behalf of [Michigan] Farm Bureau . . . for any and all insurance policies . . . written by or sold through [Michigan] Farm Bureau." (ECF No. 34-4, PageID.908.) Jamoua sold life and auto insurance, among other products. (*See e.g.*, ECF No. 34-13.) Jamoua worked in the "Southeast Region," one of Michigan Farm Bureau's five Michigan regions. (*See id.*; ECF No. 34-2, PageID.683; ECF No. 34-9, PageID.1159.) A majority, perhaps 85 percent, of Jamoua's customers were Chaldean or Arab. (ECF No. 34, PageID.563.)

2

Before turning to the specifics of Jamoua's case, a brief sketch of Farm Bureau's corporate structure is helpful. Although the record does not disclose the precise date, sometime in or around 2018, Don Simon took over as Michigan Farm Bureau's CEO. (*See* ECF No. 34-3, PageID.780, 794 ("2017, 2018 time frame, maybe"); ECF No. 34-18, PageID.1766 ("I think it was early 2019.").) Matt Taylor, the Vice President of Marketing, was part of Simon's executive-management team. (*See* ECF No. 34-3, PageID.838, 936.) Working under Simon and Taylor (and others in executive management) were the managing partners for each of the five Michigan regions. (*See* ECF No. 34-5, PageID.936; ECF No. 34-9, PageID.1217.) For the Southeast Region, the managing partners during much of Jamoua's agency were Charles Knuth, Tom Biljan, Tom Parker, and Paul Wagner; Danny Negin took over Wagner's spot at the start of 2019. (*See* ECF No. 34-5, PageID.940, 957; ECF No. 34-18, PageID.1761.) Wagner and Negin are defendants here.

More so than prior management, Simon, and perhaps Taylor too, were concerned about the "loss ratio" on auto policies. (ECF No. 34-3, PageID.820, 838–839; ECF No. 35-2, PageID.2080.) To simplify a bit, the loss ratio is the amount Michigan Farm Bureau pays on a policy for claims as compared to the amount Michigan Farm Bureau collects on a policy in premiums, i.e., it is a measure of how much money Michigan Farm Bureau makes (or loses) on a policy. (*See* ECF No. 34-2, PageID.568.) If the loss ratio exceeds 100 percent, it means that Michigan Farm Bureau paid more for claims than it collected in premiums on the policy. (*See* ECF No. 34-2, PageID.568.) Michigan Farm Bureau's goal is for agents to have a loss ratio

3

of 60 percent or less, which helped cover overhead and other expenses. (ECF No. 34-2, PageID.577; ECF No. 34-18, PageID.1776.)

By several measures, Jamoua was a successful agent. In 2017, Jamoua sold the 10th most life insurance policies (out of 126 Southeast Region agents) and the 27th most auto insurance policies (out of 135 Southeast Region agents). (ECF No. 34-6, PageID.1087, 1115.) On the other hand, in 2016 and 2017, Jamoua's loss ratio on auto policies were 171 and 124.6 percent, respectively. (ECF No. 31-11, PageID.357; *see also* ECF No. 31-11, PageID.358.)

In December 2017, Wagner (one of the four Southeast Region managers), met with Jamoua for an annual check-in. (ECF No. 34-5, PageID.965, 1036.) Jamoua remembers Wagner asking him who made up his book of business; Jamoua told Wagner that Chaldeans and Arabs were the majority of his customers. (ECF No. 34-2, PageID.614.) Jamoua recalls having a loss-ratio report with him, but Wagner made a phone call and received another report. (ECF No. 34-2, PageID.610–611.) According to Jamoua, Wagner's report showed a "very exaggerated" loss ratio, "[c]razy high." (*Id.* at PageID.611.) Jamoua recalls, "I asked [Wagner] what to do. He said he [is] going to terminate me because of my losses. [Wagner] said, [d]on't sell [to] people from your culture, don't sell people for high losses. Don't sell people [policies] for one car only. Sell for multiple car. Try to sell in Troy, away from Sterling Heights and Warren. [He] [t]ried to steer me away from them." (ECF No. 34-2, PageID.613.) Sterling Heights and Warren have significant Chaldean and Arab populations. (*See* ECF No. 34-2, PageID.645, 649; ECF No. 35-2, PageID.2203.)

In addition to Jamoua, several other Michigan Farm Bureau agents testified about how Michigan Farm Bureau viewed Middle Eastern agents and customers.

Two longtime agents, Sue Abro and Sal Yaldo, both of whom are Chaldean, state that they have never been told not to sell to particular groups. (ECF No. 31-15, PageID.405; ECF No. 31-16, PageID.409.) Abro states, "No employee of the [Farm Bureau] Companies has ever suggested to me, explicitly or implicitly, that I should either target or avoid selling insurance to people with any particular religious, ethnic, racial, or national background." (ECF No. 31-15, PageID.406.) Yaldo similarly states, "I have never been discouraged from selling insurance to members of the Chaldean or any other community." (ECF No. 31-16, PageID.410.)

But Tom Sokol, who worked as a Michigan Farm Bureau agent for seven years, experienced things differently. (ECF No. 35-2, PageID.2057.) Sokol says both Parker (a Southeast Region managing partner) and Wagner told him that Jamoua was issuing too many policies to his "own people" and that "it was hurting the loss ratio in our area." (ECF No. 35-2, PageID.2082–2083, 2205.) Sokol also recalls Wagner saying that Yaldo (who is Chaldean) "tends to write a lot of his own people, and he needs some help with that." (ECF No. 35-2, PageID.2189.)

Additionally, Jamoua, Sokol, and another former Michigan Farm Bureau agent recall that the companies would set high rates in certain parts of southeast Michigan. Jamoua recalls Michigan Farm Bureau setting high rates "in Detroit, Dearborn, Southfield, Oak Park, Sterling Heights, Warren." (ECF No. 34-2, PageID.605, 647.) According to Sokol, when Simon took over as CEO, rate increases

were "targeted" at regions with a high number of Middle Eastern customers. (ECF No. 35-2, PageID.2099–2102.)

One example where Michigan Farm Bureau employed targeted rate setting is the 48310 zip code. That zip code is for Sterling Heights, Michigan, and has a large Middle Eastern population. (*See* ECF No. 34-2, PageID.646; ECF No. 35-2, PageID.2079, 2102.) Sokol recalled that the rates for the 48310 were "through the roof" whereas adjacent zip codes without a significant Middle Eastern population had lower rates. (ECF No. 35-2, PageID.2079, 2203.) According to Sokol, "It was either Parker or Wagner, would make jokes about 48310 because that's probably the highest population of Middle Eastern people. And you know, much of Detroit, you know, Dearborn, so they would make jokes about don't write in 48310. The rates are high there." (ECF No. 35-2, PageID.2077.) Antonio Asmar, another former Michigan Farm Bureau agent, likewise recalls that Michigan Farm Bureau's rates for the 48310 zip code were "very expensive." (ECF No. 34-21, PageID.1952; *see also* ECF No. 35-2, PageID.2203.) In fact, when Asmar was still an agent for Michigan Farm Bureau, he and his fiancée were living in the 48312 zip code, another zip code for Sterling Heights; Asmar tried to get his fiancée—who had a great insurability score—insurance through Michigan Farm Bureau but the cost was "way higher" than from another insurer. (ECF No. 34-21, PageID.1973–1974.)

During or after Jamoua's December 2017 meeting with Wagner, Wagner (or another managing partner) directed Jamoua to come up with a plan to lower his loss

ratio. Jamoua recalls, "They told me you have to have a plan, and I [didn't] have any plan. So I wrote whatever Paul Wagner gave . . . me." (ECF No. 34-2, PageID.623.)

In April 2018, Jamoua met with three managing partners—Knuth, Parker, and Wagner—and presented the plan. It had four parts: (1) review customer accounts and decline those with claims over $30,000, (2) advertise locally in Troy, Michigan for three months, (3) decline to issue policies for a single vehicle unless the customer also purchased other policies, and (4) "[t]ry to avoid insuring customers from our culture unless they are in good insurability position." (ECF No. 34-2, PageID.624–625.)

Again, Jamoua says the plan, or at least the fourth point, was not his idea but Wagner's. (ECF No. 34-2, PageID.624 ("I wrote these four [points], but they were—Paul Wagner told me.").) Indeed, when later asked about avoiding customers from his culture, Jamoua responded, "I wrote what exactly they told me to write, just to keep my job going." (ECF No. 34-2, PageID.627.) Jamoua says that he never followed through on not selling to people from his culture: "I told [the managing partners that] but I didn't. It's against my principles to select people, to discriminate against people." (ECF No. 34-2, PageID.626; *see also* ECF No. 34-2, PageID.657.)

Following the April 2018 meeting, Knuth, Parker, or Wagner wrote a "memo to file." (ECF No. 31-10, PageID.354.) Regarding the plan to lower Jamoua's loss ratio, the memo stated, "The Partners told Al that it is not a 'culture' issue, but rather, it is a 'risk selection' issue and that is the reason why he is being held accountable for his loss ratio." (*Id.*) Similarly, Parker recalls, "[Jamoua] was not going to service his community. And we said no, that's not what this is about. Everyone needs to be

7

serviced. You just need to do proper field underwriting." (ECF No. 34-9, PageID.1171.) In contrast to the memo and Parker's account, Jamoua says that the managing partners did not tell him that it was a "risk selection" issue as opposed to a "culture" issue, or, at least, he does not remember them saying that. (ECF No. 34-2, PageID.628.)

Apart from Jamoua's four-part plan, higher-ups in Michigan Farm Bureau were also coming up with a plan for reducing Jamoua's loss ratio. In June 2018, Thomas Schrote, Michigan Farm Bureau's Interim Vice President, wrote a letter to Jamoua. (ECF No. 31-11, PageID.357.) The letter stated, "you met with your Managing Partner regarding your prior 3 years' Auto Loss Ratio results as of December 31, 2017." (*Id.*) Schrote noted that Jamoua's combined loss ratio on auto policies for the prior three years (2015, 2016, and 2017) was 153.9 percent. (*Id.*) "We have implemented a re-underwriting program to review your entire auto book as each policy renews," Schrote wrote. (*Id.*)

Under this re-underwriting program, Michigan Farm Bureau's underwriting department would examine information related to a customer's insurability (e.g., motor vehicle report) to decide if the auto policy that Jamoua had issued accurately reflected that customer's risk. (*See* ECF No. 31-11, PageID.357; ECF No. 34-18, PageID.1801–1802.)

From Jamoua's perspective, this was particularly problematic because he believed there were people in Michigan Farm Bureau's underwriting department that discriminated against Chaldean or Arab customers or Chaldean or Arab agents.

8

Jamoua says, "[underwriting was] attacking all the minority and black [agents]" by asking for "[a]dditional documentation" or cancelling policies "for no reason. They just tried to make our life hell." (ECF No. 34-2, PageID.620–21.) Jamoua recalls one particular underwriter who always gave agents a "hard time" when it came to customers "from Arab and Chaldean background." (ECF No. 34-2, PageID.595.) Sokol (a former Michigan Farm Bureau agent) recalls asking an underwriter for "some assistance with a Middle Eastern customer," and "they just made a comment about, you know, it being [a] funny name that, you know, they see a lot of claims. They asked me if it was a claim waiting to happen like it was a joke." (ECF No. 35-2, PageID.2198.) Sokol says that something similar happened "more than one time." (ECF No. 35-2, PageID.2197.)

Toward the end of 2018 there was an annual meeting of the Michigan Farm Bureau managing partners where the "Auto Loss Initiative" was presented. (*See* ECF No. 31-11, PageID.356; ECF No. 34-17, PageID.1714; ECF No. 34-18, PageID.1773.)

The Auto Loss Initiative (ALI) made it harder for agents placed in this program to sell auto insurance. Agents in the ALI could only quote but not "bind" auto insurance. (ECF No. 31-11, PageID.356.) Before an auto policy could bind, ALI agents had to meet with their managing partner to review five items related to the customer's insurability. (ECF No. 31-11, PageID.356.) These items included pictures of the vehicle, the customer's health-insurance card, and information on a "Fact Finder" form, i.e., a customer-information form. (ECF No. 31-11, PageID.356; ECF No. 34-18, PageID.1784, 1791; ECF No. 34-5, PageID.1039.) In addition to requiring

9

manger approval for new auto policies, an ALI agent's existing auto policies were subject to re-underwriting. (*See* ECF No. 31-11, PageID.356.) When the program started in early 2019, any agent that had both a loss ratio of 75 percent (or more) in each of 2016, 2017, and 2018 and a combined loss ratio over that period of 85 percent (or more) were subject to the ALI. (ECF No. 31-11, PageID.356; *see also* ECF No. 31-8, PageID.326.)

If an agent did not want to participate in the ALI, Michigan Farm Bureau offered the agents an option of receiving "extended earnings" (a severance of sorts) and to have the non-compete clause in their agent agreements waived. (*Id.*) For those (like Jamoua) who had been a Michigan Farm Bureau agent for less than 10 years, a case-by-case decision would be made on extended earnings. (*Id.*)

In or around December 2018, Taylor (VP of Marketing) emailed several managing partners about the ALI and stated that he needed one managing partner from each region on a conference call. (ECF No. 34-17, PageID.1714.) That apparently prompted Biljan, Parker, and Negin to meet. The trio decided that Negin (who was in the process of taking over Wagner's partnership spot) would take the lead on the ALI for the Southeast Region. (ECF No. 34-18, PageID.1774, 1778–1779.)

Around this time—December 2018 or January 2019—Biljan, Parker, and Negin met with Jamoua about the ALI. (ECF No. 34-9, PageID.1299; ECF No. 34-18, PageID.1842; ECF No. 34-2, PageID.513.) According to Negin, Biljan explained what it would mean to be in the ALI and told Jamoua that if he did not want to participate, they would try to petition Michigan Farm Bureau for extended earnings. (ECF No.

34-18, PageID.1843.) Negin recalls, "Al said that he really wasn't interested in participating [in the ALI]. That he really just wanted to relocate his family, but he needed a year to do that and asked for our help in petitioning the company to extend [a severance] offer." (*Id.*) Negin further remembers telling Jamoua that if he wanted to continue his agency, he would have "to go through the process, like all the other ALI agents." (ECF No. 34-18, PageID.1844.) Parker's account tracks with Negin's: "Al didn't want to do the [ALI] program. He wanted to seek a way to leave the company. . . . [H]e would have been required to have 10 years extended earnings to get any value. So that conversation started. . . ." (ECF No. 34-9, PageID.1300.) As for Biljan, he remembers being "very professional" at the meeting. (ECF No. 34-3, PageID.808.)

Jamoua's account of the December 2018 or January 2019 meeting is quite different. Jamoua recalls "[the managing partners] kept shouting at me and called me names. Called me a loser. Called my customers a loser. . . . They really abused me." (ECF No. 34-2, PageID.669.) According to Jamoua, "[t]hey asked me to retire early . . . . I was really afraid that they were going to do something. So I told them I would retire if they pay me." (ECF No. 34-2, PageID.672.)

From December 2018 through February 2019, Jamoua and Michigan Farm Bureau exchanged emails regarding early retirement. (ECF No. 31-14, PageID.400–403.) Ultimately, Jamoua did not accept Michigan Farm Bureau's offer of $1,000 per month for 10 years (about $120,000 in all). (ECF No. 34-2, PageID.662.)

11

In a December 2018 email to Michigan Farm Bureau, Jamoua stated that he had been selling fewer policies for two or three reasons. (*See* ECF No. 31-14, PageID.402–403.) One was Michigan Farm Bureau's requirement that agents use "Guidewire." (*Id.*) Guidewire was software that helped generate auto policy quotes and something that Simon (the CEO) wanted agents to use. (ECF No. 34-3, PageID.782–785, 787.) Jamoua also attributed lost policies to the re-underwriting mentioned in Schrote's June 2018 letter. (ECF No. 31-14, PageID.402.) And while not expressly stating that it had caused him to sell fewer policies, Jamoua explained that after the April 2018 meeting where the four-part plan was discussed, he had started insuring "low risk" customers and customers who bought multiple insurance products. (*Id.*) Jamoua reported that his "more stringent" approach to insuring customers caused him to lose "a large number of high risk customers." (*Id.*)

Despite selling fewer policies in 2018, and despite being placed on the ALI at the start of 2019, Jamoua continued as a Michigan Farm Bureau agent during 2019. But Jamoua remained an agent more in name than in practice. In 2018, Jamoua had sold 111.5 auto policies, but in 2019 he sold only five. (*Compare* ECF No. 34-14, PageID.1638, *with* ECF No. 34-15, PageID.1689.) And in 2018, Jamoua had sold 35.5 life policies, but in 2019, only four. (*Compare* ECF No. 34-14, PageID.1620, *with* ECF No. 34-15, PageID.1667.) Although the ALI permitted Jamoua to quote auto insurance and then bind it upon manager approval, Jamoua apparently believed that he was not allowed to sell auto policies. He later testified that after June 2018, Biljan

12

and Negin "completely" stopped him from selling auto policies and that in 2019, Negin did not allow him to sell "any" auto policies. (ECF No. 34-2, PageID.632, 637.)

Indeed, a March 2019 email suggests that once Jamoua was placed on the ALI, he submitted very few auto quotes to Negin for approval. That month, Jamoua asked Negin to approve an auto quote. (ECF No. 34-23, PageID.1996.) In response, Negin wrote, "Per our last conversation, you had indicated to Tom Biljan and me that you were not going to write any new auto business this year. Please let me know if you have changed [y]our mind on that issue. If so, we could get together to discuss." (ECF No. 34-23, PageID.1995.)

In June 2019, Jamoua called Negin asking for help (with what is unclear). (ECF No. 34-2, PageID.634.) According to Jamoua, "[Negin said], I don't want to insure your people. Go to Zack Toma and let him write it for you at Allstate. Said, me and Tom Parker and Tom Biljan will break into your office and steal everything, and we'll put you [out of] business." (ECF No. 34-2, PageID.634.) Jamoua says that Negin referenced Toma because Toma sold policies to Chaldean and Arab people. (ECF No. 34-2, PageID.692.)

On January 27, 2020, Jamoua filed this lawsuit. Five days later, on February 1, 2020, Jamoua and Farm Bureau ended their contractual relationship. (ECF No. 34-2, PageID.546–547.)

## B.

Jamoua's complaint has three counts. In Count I, Jamoua alleges that Farm Bureau Life Insurance Company of Michigan (and several, related Farm Bureau

companies), Wagner, and Negin (collectively, "Defendants") interfered with his contractual right to sell insurance in violation of 42 U.S.C. § 1981. (ECF No. 18, PageID.142–145.) In Count II, Jamoua alleges that Defendants, "motivated by a bias against Chaldeans and Arabs like Jamoua and his customers," "thwarted" his ability to sell insurance, in violation of Michigan's Elliott-Larsen Civil Rights Act. (ECF No. 18, PageID.145–146.) And in Count III, Jamoua asserts that because Defendants discouraged Jamoua from selling insurance to Chaldean and Arab customers, and because insurance is a "public good or service," Defendants violated ELCRA's public-accommodations provision. (*See* ECF No. 18, PageID.148.)

The parties completed discovery, and Defendants now seek summary judgment on all three counts. Given the extensive briefing and record, the Court considers the motion without further argument. *See* E.D. Mich. LR 7.1(f).

## II.

Under Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Or, stated less formally, Defendants are entitled to summary judgment only if no reasonable jury could find in favor of Jamoua. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).

## III.

### A.

The Court begins with Count I, Jamoua's claim under 42 U.S.C. § 1981. Defendants argue that they are entitled to summary judgment on this count for two

reasons: (1) Jamoua claims religious discrimination, but § 1981 does not prohibit religious discrimination, and (2) Jamoua has not identified any contractual right that they interfered with. (ECF No. 31, PageID.243–246.)

### 1.

Defendants argue that the type of discrimination asserted in this case is not the type that § 1981 prohibits. As relevant here, § 1981 promises to everyone the same contractual rights as "white citizens." 42 U.S.C. § 1981(a). As the term "white citizens" suggests, § 1981 only bars discrimination based on race. *See Saint Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 609 (1987) ("Although § 1981 does not itself use the word 'race,' [we have] construed the section to forbid all 'racial' discrimination in the making of . . . contracts."); *El-Zabet v. Nissan N. Am., Inc.*, 211 F. App'x 460, 462 (6th Cir. 2006) ("[T]he Supreme Court has held that [§ 1981] prohibits only racial discrimination[.]" (internal quotation marks omitted)). Based on that point of law, Defendants argue that Jamoua's § 1981 claim fails because he only claims that they discriminated on the basis of his religion or national origin. (ECF No. 31, PageID.244–245.)

Defendants' argument comes in two variants.

The first variant is unpersuasive because it relies on cherry-picked statements from Jamoua's deposition. Defendants say that Jamoua himself testified that Michigan Farm Bureau discriminated on the basis of religion. (ECF No. 31, PageID.245.) That is true. (ECF No. 34-2, PageID.681.) But Jamoua also testified that Michigan Farm Bureau had discriminated against him because of his "ethnicity"

and "race." (ECF No. 34-2, PageID.684; *see also* ECF No. 34-2, PageID.706 ("I was discriminated because of my ethnicity and culture.").) At summary judgment, Jamoua's testimony must be viewed in the light most favorable to him; so the Court credits these latter statements, not just Defendants' chosen statement.

In the second variant of their argument, Defendants point out that Jamoua identifies as Chaldean (ECF No. 34-2, PageID.650) and claim that "Chaldean is a term for a member of the Syrian Uniate church (a Christian religion), or may more commonly be used to identify a Roman Catholic individual of Iraqi descent." (ECF No. 31, PageID.245.) In other words, Defendants imply that discrimination against someone for being Chaldean is merely religious or national-origin discrimination, neither of which § 1981 prohibits. (*See id.*)

The Court is not convinced. Although § 1981 only prohibits race discrimination, "the Supreme Court [has taken] a broad view of what constitutes prohibited discrimination on the basis of 'race' under § 1981, holding that discrimination based on 'ancestry or ethnic characteristics' constituted race-based discrimination under the statute." *Amini v. Oberlin Coll.*, 259 F.3d 493, 503 (6th Cir. 2001) (quoting *Saint Francis College*, 481 U.S. at 613). And here, Jamoua testified that "Chaldean" is "a religion, culture, and ethnicity, everything." (ECF No. 34-2, PageID.597.) Jamoua's description is consistent with other definitions of "Chaldean." *See* Adhid Miri, *Chaldeans in Michigan*, The Chaldean News (Mar. 27, 2020), https://perma.cc/SQ6W-PXGR ("Chaldeans are Aramaic-speaking people indigenous to Iraq. . . . Chaldeans and other Iraqi Christians link their homeland to their

identity, culture, language, faith, traditions, etc."); Mary C. Sengstock, *Chaldean Americans*, World Culture Encyclopedia, https://perma.cc/S8QX-ELJM ("As a result of their religious and linguistic differences from other Iraqi immigrants, Chaldeans tend not to identify themselves either with Iraq or the Arab world, but prefer being called Chaldean Americans."). Defendants have not shown that Chaldeans lack a shared "ancestry" or shared "ethnic characteristics," *see Saint Francis College*, 481 U.S. at 613, and so the Court will not grant Defendants summary judgment on the grounds that discrimination against Chaldeans is outside § 1981's purview.

## 2.

With that, the Court turns to whether Jamoua has presented sufficient evidence for a reasonable jury to find that Defendants violated § 1981 by interfering with his contractual rights.

As relevant here, § 1981 provides, "All persons . . . shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a). The term "make and enforce contracts" includes the "enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b). Recently, the Supreme Court has clarified that racial animus must be the but-for cause of the impairment of the contractual right. *See Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, — U.S. —, 140 S. Ct. 1009, 1014 (2020).

Putting all this together, there are two key questions: (1) could a reasonable jury find that Defendants intentionally discriminated against Jamoua based on race? (2) If so, could they also find Defendants' discrimination was the but-for cause of

Jamoua not "enjoy[ing] . . . benefits or privileges" of his agent agreement with Michigan Farm Bureau? *See Comcast*, 140 S. Ct. at 1014; *Amini v. Oberlin Coll.*, 440 F.3d 350, 358 (6th Cir. 2006).

Although it would be straightforward enough to decide whether a reasonable jury could find for Jamoua on both these questions, when a plaintiff brings an employment-discrimination claim under § 1981, courts use the more-involved Title VII framework. *See Rogers v. Henry Ford Health Sys.*, 897 F.3d 763, 771 (6th Cir. 2018). Under that framework, courts first decide whether there is direct or circumstantial evidence of race discrimination, and, if there is only circumstantial evidence, then apply *McDonnell Douglas* burden-shifting. *See White v. Baxter Healthcare Corp.*, 533 F.3d 381, 391 (6th Cir. 2008).

Yet, in seeking summary judgment on Jamoua's § 1981 claim, Defendants do not apply this Title VII framework. Instead, Defendants argue that Jamoua "cannot point to a contractual right under his Agent Agreement that was impaired, let alone a right intentionally impaired due to racial discriminatory animus." (ECF No. 31, PageID.246.) Although Defendants have not used the Title VII framework, their approach is reasonable—it directly goes to the ultimate question: Was Defendants' race discrimination a but-for cause of Jamoua being deprived of a contractual benefit? So the Court will proceed along the route paved by Defendants. (Even if this analytical route is technically incorrect, it does not get Defendants where they want to go, so the Court perceives no prejudice to Jamoua in proceeding this way.)

While Defendants have highlighted portions of Jamoua's agent agreement that gave Michigan Farm Bureau the right to reject applications for insurance, prescribe the forms used for insurance, and set insurance premiums, the agent agreement also granted Jamoua rights. As Jamoua points out (ECF No. 34, PageID.456), he was "authorized to solicit applications on behalf of [Michigan] Farm Bureau . . . for any and all insurance policies . . . written by or sold through [Michigan] Farm Bureau" (ECF No. 34-4, PageID.908). And Jamoua's income was largely (if not solely) dependent on selling Michigan Farm Bureau insurance. (*See* ECF No. 34-2, PageID.554.) So, contrary to Defendants' argument, Jamoua has "point[ed] to a contractual right under his Agent Agreement that was impaired."

But that only gets Jamoua part way to presenting his § 1981 claim at trial. It must also be the case that a reasonable jury could find that (1) the contractual right Jamoua has identified was actually impaired and (2) that the but-for cause of the impairment was Defendants' racial animus.

Establishing the first point is easy; there is ample evidence that Jamoua's contractual right to solicit policies was impaired. In particular, it is not disputed that Jamoua sold fewer policies in 2018 than in 2017 and still fewer policies in 2019 than in 2018:

|      | Auto Policies Sold | Life Policies Sold | General Lines Policies Sold |
|------|--------------------|--------------------|------------------------------|
| 2017 | 130.5              | 43.5               | 151                          |
| 2018 | 111.5              | 35.5               | 135                          |
| 2019 | 5                  | 4                  | 53                           |

(ECF Nos. 34-6, 34-14, 34-15.)

Defendants point out that Michigan Farm Bureau paid Jamoua more in each of 2018 and 2019 than in 2017. (ECF No. 31, PageID.233.) While this is true (ECF No. 31-6, PageID.308–310), it appears that Jamoua's income in 2018 and 2019 was based in part on policies he sold in prior years (*see* ECF No. 34-27, PageID.2029). After all, Jamoua's "total new commissions" in each of 2018 and 2019 are but a fraction of what Michigan Farm Bureau paid Jamoua in 2018 and 2019. (*Compare* ECF No. 34-14, PageID.1656, 1706 ($54,000 and $14,000 in new commissions in 2018 and 2019, respectively), *with* ECF No. 31-6, PageID.309–310 ($319,000 and $277,000 in total earnings in 2018 and 2019, respectively).) And even if Jamoua made more in each of 2018 and 2019 than 2017, he presumably would have made still more had he sold more policies; and, as just stated, there is no debate that Jamoua sold fewer policies in 2018 and 2019 than in 2017. Accordingly, a reasonable jury could find that Jamoua's contractual right to solicit policies was impaired during 2018 and 2019.

A reasonable jury could also find that Defendants' racial animus was a but-for cause of the impairment. *See Comcast*, 140 S. Ct. at 1014.

According to Jamoua, in December 2017, he met with Wagner who expressed concerns about his loss ratio. At this meeting, Jamoua told Wagner that the majority of his customers were Chaldean and Arab. (ECF No. 34-2, PageID.614.) And Jamoua recalls Wagner telling him to not sell to people of "[his] culture" and to stay away from Sterling Heights and Warren (cities with significant Chaldean and Arab customers) and to instead sell in Troy. (ECF No. 34-2, PageID.613.) Then, in April 2018, Jamoua presented a plan to reduce his loss ratio to three managing partners,

including Parker and Wagner. That plan—which Jamoua says was really Wagner's plan—included "advertise and market locally in Troy 3 months" and "avoid . . . customers from our culture unless they are in good insurability position." (ECF No. 31-10, PageID.354.) Although the managing partners say they told Jamoua that it was a "risk selection" issue not a "culture" issue (*see id.*), Jamoua denies being so informed (ECF No. 34-2, PageID.628), and, at the summary-judgment stage, his account controls. So there is evidence that Wagner had directed Jamoua not to sell to people of "[his] culture" and that Jamoua understood that directive to be part of the plan for lowering his loss ratio. Coupling that evidence with evidence that about 85 percent of Jamoua's customers were Chaldean or Arab, a reasonable jury could find that Wagner's racist directive caused Jamoua to solicit (and thus sell) fewer policies in 2018 and 2019.

And Wagner's directive is not the only evidence of racial animus that a jury could find caused Jamoua to sell fewer policies in 2018 and 2019. Although the timing is not clear, there is evidence that around the time Simon took over as Michigan Farm Bureau's CEO, there was an effort to increase rates in areas of southeast Michigan with a significant population of customers with Middle Eastern ancestry. (*See* ECF No. 34-2, PageID.647; ECF No. 34-21, PageID.1952; ECF No. 35-2, PageID.2079, 2082–2083, 2100–2101.) And, again, with about 85 percent of Jamoua's customers being Chaldean or Arab, a jury could find that the increased rates targeted at these populations drove his customers away and hampered his ability to sell policies. Defendants argue that Michigan Farm Bureau merely set rates by geographic region.

21

(*See* ECF No. 31, PageID.251 n.4; ECF No. 39, PageID.2238 n.1.) But even assuming that is true, Defendants have not shown how increasing rates for an entire zip code with a large Middle Eastern population is not racial stereotyping. While Michigan Farm Bureau can make an individualized assessment of a customer's likelihood of filing a claim, Defendants have cited no authority permitting Michigan Farm Bureau to assume that an entire class of people, e.g., all those living in the 48310 zip code are more likely to file a claim. So a reasonable jury could find that the manner in which Michigan Farm Bureau set its rates discriminated against Middle Eastern customers, including Chaldeans and Arabs. Thus, a reasonable jury could find that Michigan Farm Bureau's rate setting was also a race-based cause for Jamoua selling fewer policies in 2018 and 2019.

In short, evidence that Wagner directed Jamoua to not sell to people of "[his] culture" in December 2017, along with evidence that Michigan Farm Bureau adjusted rates upwards in areas with significant Middle Eastern customers in or around 2018, would permit a reasonable jury to find that Defendants' racial animus was a but-for cause of Jamoua soliciting fewer policies in 2018 and 2019. And under his agent agreement, Jamoua was "authorized to solicit applications on behalf of Farm Bureau Insurance for any and all insurance policies . . . written by or sold through Farm Bureau Insurance." So a reasonable jury could find for Jamoua on his § 1981 claim.

Defendants make a few arguments that, in their view, warrant a different conclusion. (Although some of these arguments appear in the portion of Defendants'

brief addressing Jamoua's ELCRA claims, they seem to apply to his § 1981 claim as well, and so the Court will address them here.)

For one, Defendants point out that Jamoua ignored Wagner's directive to not sell to people of "[his] culture." (ECF No. 39, PageID.2240.) Jamoua did testify, "I was insuring everybody because it's against my principle to select people. . . . [Michigan Farm Bureau was] trying to make me select certain individual[s], which is against my principle. . . . I [submitted] whatever they told me [to bind quotes], but I took everybody." (ECF No. 34-2, PageID.657–658; *see also* ECF No. 34-2, PageID.626.) So, say Defendants, any directive by the managing partners to not sell to Chaldeans or Arabs could not have interfered with Jamoua's contractual right to solicit insurance— Jamoua never followed the directive. (*See* ECF No. 39, PageID.2240.)

This is a strong argument, but it does not warrant summary judgment. Numbers do not lie. Jamoua sold fewer auto, life, and general lines policies in 2018 and 2019 than in 2017—i.e., his numbers were down across the board. So even if Jamoua testified that he ignored Wagner's directive and continued to sell to people of his culture, the sales numbers are strong evidence that Jamoua had, in fact, changed how he was soliciting insurance. Indeed, in a December 2018 email to Michigan Farm Bureau, Jamoua stated, "The steps we enforced after our meeting with the Partnering manager on 4/30/2018 has helped our agency to reduce our loss ratio." (ECF No. 31-14, PageID.402.) And according to the "memo to file" about that April 2018 meeting, those steps included, "advertise and market locally in Troy 3 months" and "avoid . . . customers from our culture unless they are in good insurability position." (ECF No.

31-10, PageID.354.) Thus, despite Jamoua's testimony that he ignored Wagner's directive, Jamoua's December 2018 email combined with the drop in policies sold would permit a reasonable jury to find that Jamoua solicited fewer Chaldean or Middle Eastern customers—just as Wagner had directed. In any event, Jamoua had no control over how rates were set, and so even if Jamoua ignored Wagner's directive, a reasonable jury could still find that Michigan Farm Bureau's race-based rate setting caused Jamoua to solicit fewer policies in 2018 and 2019.

Defendants also argue that "the only manner in which [they] allegedly interfered with [Jamoua's] contractual rights was by placing him in the ALI program" and that the ALI was not discriminatory. (ECF No. 39, PageID.2240.)

There is some evidence showing that an agent's race did not factor into their placement on the ALI. For instance, Jamoua has asserted that Wagner and other managing partners had animus toward Chaldeans and Middle Eastern people, but the evidence suggests that the managing partners did not create the ALI or decide which agents would participate in the ALI. (ECF No. 34-3, PageID.862; ECF No. 34-17, PageID.1714; ECF No. 34-18, PageID.1773.) Jamoua makes much of the fact that when the ALI was starting up, five agents were identified for participation and two were Chaldean and one was Arab. (ECF No. 34, PageID.446.) But Defendants assert, and Jamoua does not dispute, that during the ALI's first year, Caucasian agents were placed on the program and that the same was true for 2020 and 2021. (ECF No. 31-12, PageID.361–362; *see also* ECF No. 34-20, PageID.1906.) So Defendants have some evidence that the selection criteria for the ALI (i.e., loss ratio) were race neutral.

24

But even if the ALI applied to all agents regardless of race, that does not necessitate summary judgment for at least two reasons.

First, Defendants have not adequately addressed the interplay between the ALI and the managing partners' directives to Jamoua to not sell to people of "[his] culture." The aim of the ALI was for agents to lower their auto loss ratios—indeed the only way for agents to complete the program was to drop their loss ratio to about 60 percent. (ECF No. 31-11, PageID.356.) And while this was true for all ALI agents, Jamoua had been told *how* he should drop his loss ratio: by not selling to people of "[his] culture." So unlike other ALI agents who were presumably free to lower their loss ratios in a race-neutral manner, Jamoua was directed to lower his loss ratio in a race-based manner. Defendants also do not address the fact that under the ALI, Jamoua had to submit auto quotes to Negin for his approval, and that, in January 2019, according to Jamoua, Negin called Jamoua's customers "losers," and in June 2019, Negin stated, "I don't want to insure your people. Go to Zack Toma and let him write it for you at Allstate." (Toma is Chaldean and was selling insurance to Chaldeans and Arabs. (ECF No. 34-2, PageID.506, 692).) So even assuming that the ALI program itself was race neutral, a reasonable jury could find that it applied to Jamoua in a race-based manner. And in all events, Jamoua was not placed on the ALI until the start of 2019. (*See* ECF No. 34-9, PageID.1299; ECF No. 34-18, PageID.1842–1843.) So the ALI cannot explain the drop in policies in 2018; and Jamoua sold 43 fewer policies in 2018 than in 2017.

Defendants also point out that Jamoua admitted that one reason he sold fewer policies was because of Guidewire. (ECF No. 31, PageID.238, 250.) And Defendants say that all agents, regardless of race, had to use that auto-quoting software.

On this record, the Court cannot say that Guidewire fully accounts for the drop in policies. It is true that in his December 2018 email, Jamoua admitted that Guidewire caused him to lose a "large number of policies." (ECF No. 31-14, PageID.402.) But he also indicated in that email that Guidewire had been implemented in the "summer of 2016." (ECF No. 31-14, PageID.402; *but see* ECF No. 34-2, PageID.717 (guessing that he began using Guidewire in "mid of 2018.").) If Jamoua had been using Guidewire since 2016, then that software cannot explain the drop in policies starting in 2018. And even if Jamoua started using Guidewire in 2018, no evidence shows that it accounts for *all* of the lost policies in 2018 and 2019.

Defendants also argue that even if a reasonable jury could find in favor of Jamoua on his § 1981 claim, it could not hold all of the named defendants liable under § 1981. As noted, Jamoua has sued several Farm Bureau companies. But, Defendants say, only Farm Bureau General Insurance Company of Michigan sold auto insurance so Jamoua's § 1981 claim can only proceed against Farm Bureau General. (ECF No. 31, PageID.244.)

The Court does not believe that Jamoua's § 1981 claim is so narrow. When pleading this claim, Jamoua alleged in part, "Because of Wagner, Negin, and Michigan Farm Bureau's bias against Chaldeans and Arabs like Jamoua and his customers, Jamoua has suffered economic damages from the loss of approximately

half of his book of business." (ECF No. 18, PageID.144–145.) That allegation is not limited to lost auto policies. And in his summary-judgment response, Jamoua says Defendants interfered with his contractual right "to solicit applications on behalf of Farm Bureau for any and all insurance policies." (ECF No. 34, PageID.456.) And "any and all insurance policies" is, obviously, broader than auto policies. Further, it is reasonable to infer that some of Jamoua's auto-insurance customers were also life or homeowners insurance customers. Indeed, Sokol (a former Michigan Farm Bureau agent) testified that Wagner and Negin would tell Middle Eastern agents that if they were going to sell an auto policy, they should bundle it with a life policy. (ECF No. 35, PageID.2110–2112.) Further, it appears that the managing partners for the Southeast Region worked for all the Michigan Farm Bureau companies such that their actions were not solely on behalf of Farm Bureau General. Thus, the Court does not agree with Defendants that the only company that can be held liable under § 1981 is Farm Bureau General.

In the same vein, Defendants argue that Negin and Wagner are entitled to summary judgment on Jamoua's § 1981 claim even if that claim survives against Michigan Farm Bureau. Defendants say that Negin and Wagner "played no personal role in choosing agents to participate in the ALI program." (ECF No. 31, PageID.244.) But, again, Jamoua's § 1981 claim, as this Court understands it at least, is not based solely on the ALI, let alone how agents were selected for the ALI.

In sum, a reasonable jury could find that Defendants' racial animus caused Jamoua to solicit fewer policies in 2018 and 2019, and thus impaired Jamoua's

contractual right to solicit policies. Defendants are not entitled to summary judgment on Count I, Jamoua's § 1981 claim.

## B.

Count II of Jamoua's complaint asserts that Defendants violated the employment-discrimination provision of Michigan's Elliott-Larsen Civil Rights Act. (ECF No. 18, PageID.145.) Under that provision, "an employer" shall not "discriminate against an individual with respect to . . . a term, condition, or privilege of employment, because of religion, race, color, [or] national origin[.]" Mich. Comp. Laws § 37.2202(1)(a). Defendants make two arguments for summary judgment: (1) that Jamoua was an independent contractor and thus not shielded by the employment-discrimination provision, and (2) Jamoua lacks evidence that they engaged in unlawful discrimination. (ECF No. 31, PageID.246–250.)

## 1.

Defendants first argue that "ELCRA only applies to employees," and so Jamoua, as an independent contractor, cannot pursue an unlawful discrimination claim under ELCRA. (ECF No. 31, PageID.257.)

Defendants' premise—that "ELCRA only applies to employees"—is mistaken. In *McClements v. Ford Motor Company*, Ford hired AVI Food Systems to operate cafeterias at one of its assembly plants. 702 N.W.2d 166, 168 (Mich. 2005). AVI, in turn, hired Milissa McClements to work at one the cafeterias. *Id.* McClements was sexually harassed by a Ford employee. *Id.* at 168–169. McClements sued Ford under ELCRA for failing to prevent the sexual harassment. *Id.* at 169. The Michigan

Supreme Court held that if Ford "affected or controlled a term, condition, or privilege of [McClements'] employment," she could pursue an ELCRA claim against Ford. *Id.* at 173. In other words, ELCRA liability was not limited to McClements' employer but extended to any employer that affected or controlled a term of her employment. *See id.* So even though Jamoua's agent agreement expressly classifies him as an independent contractor, the question under *McClements* is whether Michigan Farm Bureau "affected or controlled a term, condition, or privilege of [his] employment."

As Jamoua points out (ECF No. 34, PageID.462), the Michigan Court of Appeals answered this very question in *Cook v. Farm Bureau Life Insurance Company of Michigan*, No. 341330, 2019 WL 1460163 (Mich. Ct. App. Apr. 2, 2019). There (like here), John Cook was a Michigan Farm Bureau agent and sued Michigan Farm Bureau for discrimination under ELCRA. *Id.* at *1. Cook's agent agreement stated, "The Agent acknowledges that he/she is an independent contractor for all purposes and situations governed by this Agreement" and further stated that Michigan Farm Bureau "will not assert[] control over the Agent's daily activities" and that Cook would "exercise his/her own judgment as to the time, place, and manner of soliciting insurance." *Id.* at *3. But Cook's agent agreement also gave Michigan Farm Bureau "the right, in its sole discretion, to modify the Agent Compensation Schedules" and the right to reassign an agent's business, even if the business had been personally produced by the agent. *Id.* at *3–4. Applying the test set out in *McClements*, the Michigan Court of Appeals concluded, "The terms of the independent contractor agreement clearly establish that Farm Bureau affected or

29

controlled a term, condition, or privilege of plaintiff's employment—primarily that of compensation." *Id.* at *4. Thus, Cook could pursue an ELCRA claim against Michigan Farm Bureau. *See id.*

*Cook* is persuasive on the facts of this case. Jamoua's agent agreement is the same as Cook's in every material way. *Compare Cook*, 2019 WL 1460163, at *3–4, *with* (ECF No. 31-2, PageID.263–271). And in addition to the provisions that the court in *Cook* found persuasive, this Court notes that under Jamoua's agent agreement, Michigan Farm Bureau had the right to "accept[] or reject[]" any application for insurance and to prescribe all "premiums, fees, and charges for insurance." (ECF No. 31-2, PageID.265–265.) In other words, Michigan Farm Bureau could greatly affect Jamoua's ability to bind policies. And Jamoua's pay was based largely (if not entirely) on his ability to bind policies. Pay is certainly a "term, condition, or privilege of the nonemployee's employment." *McClements*, 702 N.W.2d at 173. Accordingly, the Court finds that Jamoua may pursue an ELCRA employment-discrimination claim against Defendants.

In rebuttal, Defendants argue that *Cook* is an unpublished, non-precedential decision and runs contrary to three published, precedential decisions. (ECF No. 39, PageID.2242.)

Defendants' three cases are not persuasive. True, in two of Defendants' cases, the Michigan Court of Appeals found that the plaintiff needed to be the defendant's employee to pursue an ELCRA claim against the defendant. *See Badiee v. Brighton Area Sch.*, 695 N.W.2d 521, 536 (Mich. Ct. App. 2005); *Kamalnath v. Mercy Mem'l*

*Hosp. Corp.*, 487 N.W.2d 499, 505 (Mich. Ct. App. 1992). But both *Badiee* and *Kamalnath* were decided before the Michigan Supreme Court's decision in *McClements*. And under *McClements*, whether the plaintiff was an employee of the defendant is not dispositive of his ability to pursue an ELCRA claim against the defendant. *See* 702 N.W.2d at 173. As for Defendants' third case, not only was it also decided before *McClements*, the case involved Michigan's no-fault statute, not ELCRA. *See Parham v. Preferred Risk Mut. Ins. Co.*, 335 N.W.2d 106, 108 (Mich. Ct. App. 1983).

In sum, the Court finds that because Defendants affected or controlled significant terms of Jamoua's employment, he may pursue a claim that they violated ELCRA's employment-discrimination provision.

## 2.

The Court thus turns to the merits of Jamoua's claim that Defendants "discriminate[d] against [him] with respect to . . . a term, condition, or privilege of employment, because of religion, race, color, [or] national origin[.]" Mich. Comp. Laws § 37.2202(1)(a).

In addressing Jamoua's § 1981 claim, the Court also addressed almost all of Defendants' arguments regarding Jamoua's employment-discrimination claim under ELCRA. And to prove a § 1981 claim, a plaintiff must establish that racial animus was the but-for cause of the deprivation of a contractual benefit which is at least as demanding as the causation standard under ELCRA. *Compare Hazle v. Ford Motor Co.*, 628 N.W.2d 515, 522 (Mich. 2001) ("motivating factor"), *with Hecht v. Nat'l*

*Heritage Acads., Inc.*, 886 N.W.2d 135, 146 (Mich. 2016) ("but for" causation); *see also Hrapkiewicz v. Wayne State Univ. Bd. of Governors*, 910 N.W.2d 654, 654 (Mich. 2018) (Markman, J., dissenting from denial of leave) (discussing inconsistency created by *Hazle* and *Hecht*). So for essentially the same reasons that Defendants are not entitled to summary judgment on Jamoua's § 1981 claim, they are not entitled to summary judgment on his claim that they violated ELCRA's employment-discrimination provision.

But in the interests of completeness, the Court will apply the framework used to analyze claims of discrimination under ELCRA. (As noted, courts also use this framework to analyze employment-discrimination claims pursuant to § 1981, but given Defendants' briefing, the Court directly addressed the elements of a § 1981 claim. So the following analysis also serves as a supplement to the prior analysis of Jamoua's § 1981 claim.)

Under the framework used to analyze claims of discrimination under ELCRA, courts first decide whether there is "direct evidence" of discrimination. Direct evidence is "evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Sniecinski v. Blue Cross & Blue Shield of Michigan*, 666 N.W.2d 186, 192 (Mich. 2003); *accord Lowe v. Walbro LLC*, 972 F.3d 827, 832 (6th Cir. 2020) (applying ELCRA).

Here, while close, Jamoua does not have direct evidence of discrimination. True, in December 2017, Wagner allegedly directed Jamoua to not sell insurance to people of "[his] culture." And it is not disputed that Jamoua sold fewer insurance

32

policies in 2018 than in 2017. The problem for Jamoua, though, is that he testified that he did not obey Wagner's command. And, as discussed when addressing Jamoua's § 1981 claim, a jury would have to infer that the cause of Jamoua's changed solicitation practices was Wagner's racist directive or Michigan Farm Bureau's rate setting. So this is not a direct evidence case. *See Martinez v. Cracker Barrel Old Country Store, Inc.*, 703 F.3d 911, 915 (6th Cir. 2013) ("[D]irect evidence of discrimination does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice against members of the protected group.").

When, as here, direct evidence is lacking, courts use the *McDonnell Douglas* framework to analyze claims under ELCRA's employment-discrimination provision. *Hazle v. Ford Motor Co.*, 628 N.W.2d 515, 521 (Mich. 2001). Under this framework, Jamoua has the burden of establishing a prima facie case of discrimination. If he carries this burden, "a presumption of discrimination arises," and Defendants must produce evidence of a non-discriminatory reason for the adverse action. *Id.* at 521–22. If Defendants carry their burden, Jamoua "must demonstrate that the evidence in the case, when construed in [his] favor, is sufficient to permit a reasonable trier of fact to conclude that discrimination was a motivating factor for the adverse action." *Id.* at 522 (internal quotation marks omitted).

To establish a prima facie case of discrimination under ELCRA, Jamoua must show (1) he is a member of a protected class, (2) Defendants subjected him to an adverse employment action, (3) he was qualified to solicit insurance, and (4) "he

33

suffered the adverse employment action under circumstances giving rise to an inference of unlawful discrimination." *Cadoura v. Flat Rock Fire Dep't*, No. 353618, 2021 WL 4238119, at *4 (Mich. Ct. App. Sept. 16, 2021).

The parties do not dispute the first or third element.

As for the second element, there is adequate evidence that Jamoua suffered an adverse action. In addressing Jamoua's § 1981 claim, the Court found that his contractual right to solicit policies had been impaired. In particular, Jamoua sold fewer policies in 2018 than in 2017 and still fewer in 2019. And Jamoua's income was tied to selling policies. As for Defendants' argument that Jamoua actually made more money in each of 2018 and 2019 than in 2017, the Court has already explained that the evidence suggests that Jamoua's earnings in 2018 and 2019 were based on policies sold in prior years. And even if that were not the case, the fact that Jamoua made more in 2018 and 2019 than in 2017 does not show he was not subject to an adverse action; had Jamoua sold more policies in 2018 and 2019, he would have made more than he did those years. So Jamoua has evidence that he suffered an adverse action. *See Major v. Vill. of Newberry*, 892 N.W.2d 402, 413 (Mich. Ct. App. 2016) (explaining that "[t]here is no exhaustive list of what constitutes adverse employment action" and that "a material loss of benefits . . . or other indices that might be unique to a particular situation . . . have all been recognized as adverse employment actions").

That leaves the fourth element of the prima facie case. What the Court has already said in the context of addressing Jamoua's § 1981 claim also explains why this element is met. In particular, the Court explained that based on evidence that

Wagner directed Jamoua not to sell to people of "[his] culture," and based on evidence that Michigan Farm Bureau set higher rates in areas with significant Middle Eastern customers, a reasonable jury could find that racial animus caused Jamoua to sell fewer policies. That same explanation supports a finding that Jamoua "suffered [an] adverse employment action under circumstances giving rise to an inference of unlawful discrimination." *Cadoura*, 2021 WL 4238119, at *4.

In their motion, Defendants argue that Jamoua has not identified any "similarly-situated agent outside of his protected categories who was treated more favorably than him." (ECF No. 31, PageID.250.) That is true. And it is true that courts sometimes articulate the fourth element of a prima facie case as requiring a plaintiff to show that "others, similarly situated and outside the protected class, were unaffected by the employer's adverse conduct." *Town v. Michigan Bell Tel. Co.*, 568 N.W.2d 64, 68 (Mich. 1997).

Even though Jamoua has not identified an agent whose national origin was not in the Middle East and who was not precluded from selling to his people, the Court finds that Jamoua has satisfied the fourth element of his prima facie case. To start, the Michigan Supreme Court has at least twice used the "circumstances giving rise to an inference of unlawful discrimination" formulation for the fourth element of the prima facie case. *Sniecinski v. Blue Cross & Blue Shield of Michigan*, 666 N.W.2d 186, 193 (Mich. 2003); *Hazle v. Ford Motor Co.*, 628 N.W.2d 515, 521 (Mich. 2001); *see also Martinez v. Cracker Barrel Old Country Store, Inc.*, 703 F.3d 911, 915 (6th Cir. 2013) (applying ELCRA). And the Michigan Supreme Court has stated that the

35

elements of the prima facie case "should be tailored to fit the factual situation at hand." *Hazle*, 628 N.W.2d at 521 n.6; *see also Lytle v. Malady*, 579 N.W.2d 906, 915 (Mich. 1998) (providing that *McDonnell Douglas* is "not to be applied mechanically, but with due deference to the unique facts of the individual case"). The logic behind the "similarly situated" formulation is that if two employees—materially identical except for say, race—were treated differently, an inference arises that race was the reason for the disparate treatment. But that very same inference can arise from other evidence. And here, there is evidence that Jamoua was told not to sell to people of "[his] culture" and that Michigan Farm Bureau set higher rates in areas with significant Chaldean and Arab populations. From that evidence, an inference arises that religion, race, or national origin was a motivating factor in Jamoua selling fewer policies—comparator or no comparator.

At step two of the *McDonnell Douglas* framework, Defendants say that "significant auto losses were harming" Michigan Farm Bureau and that those losses were a "legitimate non-discriminatory business concern." (ECF No. 31, PageID.250.) And, say Defendants, the ALI was created to address this legitimate business concern. (*Id.*)

While lowering loss ratios may be a legitimate business aim, the means for doing so must still be lawful. So while Michigan Farm Bureau could make an individualized assessment about how likely a customer is to file a claim, it could not assume that people of a certain race, religion, or national origin would be more likely to file claims than others. And if Jamoua's evidence is credited, Defendants did just

that: they told Jamoua not to sell to people of "[his] culture" and increased rates for entire zip codes. In other words, there is evidence that Defendants assumed that Middle Eastern people—as a group—were more likely than other people to file claims. The Court thus agrees with Jamoua that "Defendants cannot explain how their direction to Jamoua that he improve his loss ratio *by* ceasing to sell insurance to his fellow Chaldeans and other Middle Eastern people is a legitimate business decision." (ECF No. 34, PageID.459 (emphasis added).) Accordingly, while requiring an agent to lower his loss ratio may be a legitimate, non-discriminatory reason for the agent selling fewer policies, requiring an agent to lower his loss ratio *by* directing him to not sell to people of "[his] culture" and *by* increasing rates in areas that have a significant number of customers of a particular religion, race, or national origin is not a legitimate, non-discriminatory reason for the agent selling fewer policies.

As Defendants have not carried their burden of production at step two of the *McDonnell Douglas* framework, they have not rebutted the presumption of discrimination that arose from step one. *See Hazle*, 628 N.W.2d at 521–22. So Defendants are not entitled to summary judgment on Jamoua's claim that they violated ELCRA's employment-discrimination provision.

## C.

In Count III of his complaint, Jamoua claims that Defendants violated a different ELCRA provision. (*See* ECF No. 18, PageID.147–150.) In addition to prohibiting employment discrimination, ELCRA prohibits "a person" from "[d]eny[ing] an individual the full and equal enjoyment of the . . . privileges . . . of a

37

place of public accommodation . . . because of religion, race, color, [or] national origin." Mich. Comp. Laws § 37.2302(a). The Court will refer to this provision of ELCRA as the "public-accommodations provision."

Defendants argue that they are entitled to summary judgment on Count III because Jamoua lacks statutory standing to bring this claim, i.e., the public-accommodations provision protects Jamoua's customers, not Jamoua. (*See* ECF No. 31, PageID.251.)

Defendants are correct—to some extent. In Count III, Jamoua does allege that Defendants unlawfully denied "Chaldeans and Arabs . . . insurance through Al Jamoua, the agent of their choosing, and by raising premium rates in the town where they live to discourage their business." (ECF No. 18, PageID.150.) Jamoua's customers, not Jamoua, should pursue this claim.

A case cited by Defendants, *Novak v. Nationwide Mutual Insurance Company*, 599 N.W.2d 546 (1999), supports this determination. There, Terry Novak sued Nationwide under ELCRA's public-accommodations provision. 599 N.W.2d at 555. Novak accused Nationwide of redlining, i.e., denying insurance to minority customers or otherwise making it more difficult for minority customers to obtain insurance. *See id.* at 555. But Novak was not one of these customers; instead Novak had signed an agreement with Nationwide to sell insurance. *See id.* at 549. The Michigan Court of Appeals explained, "[The public-accommodations provision] . . . protects *the persons who are being denied goods and services*, not the persons who are attempting to provide the goods and services." *Id.* at 555. The court continued, "The minorities to

38

whom defendants allegedly denied insurance coverage, as the persons protected by the statute, are the proper plaintiffs for a redlining claim." *Id.*

Just so here. To the extent that Jamoua claims that members of the public were precluded from purchasing or maintaining Michigan Farm Bureau insurance on account of their race, religion, or national origin, *Novak* is on point. So Defendants are entitled to summary judgment on that portion of Count III.

But in Count III, Jamoua also pleads that Defendants "interrupted Jamoua's business and thwarted his ability to propose and sell insurance policies to his Chaldean and Arab customers." (ECF No. 18, PageID.149.) And in his response brief, Jamoua argues that "[t]he provision and sale of insurance policies is a public service covered" by ELCRA's public-accommodations provision. (ECF No. 34, PageID.468.) So Jamoua has also asserted that Defendants impaired *his* privilege of soliciting and selling insurance on account of race, religion, or national origin. To the extent that Count III is based on this assertion, Defendants have not shown they are entitled to summary judgment.

A case cited by Jamoua, *Haynes v. Neshewat*, 729 N.W.2d 488 (Mich. 2007), supports this conclusion. There, Dr. Gregory Haynes maintained clinical privileges at a hospital so that he could treat patients needing hospitalization. *Id.* at 491. But, according to Haynes, the hospital had interfered with his right to use the hospital on account of his race. *Id.* So Haynes sued alleging, among other things, that the hospital violated ELCRA's public-accommodations provision. The Michigan Supreme Court found that on the one hand, Haynes' right to use the hospital to treat patients was a

39

"privilege" and, on the other hand, that the hospital was a "place of public accommodation." 729 N.W.2d at 494. In the Michigan Supreme Court's view, the "privilege" did not have to be one offered to the public: "Nowhere within the wording of [the public-accommodations provision] is it required that the goods, services, facilities, privileges, advantages, or accommodations be offered to the public. We will not read into the statute a limitation that is not there." *Id.* It sufficed that Haynes alleged that, on account of his race, he was denied the "privilege" of treating patients at the hospital and that the hospital was a "place of public accommodation." *See id.*

Jamoua's situation is like Haynes'. Although the privilege of soliciting and selling Michigan Farm Bureau insurance is not a right available to the public (it is only available to Michigan Farm Bureau agents), Haynes' privilege was also not a right available to the public (it was only available to doctors with medical-staff privileges at the hospital). And just as Haynes' privilege was at a "place of public accommodation," so was Jamoua's—a company that sells insurance to the public falls comfortably within the definition of a "place of public accommodation." *See* Mich. Comp. Laws § 301(a) (defining "place of public accommodation" to include "a business" or "institution of any kind" "whose goods [or] services . . . are extended, offered, sold, or otherwise made available to the public"). Thus, to the extent that Jamoua claims that Defendants' racial, religious, or national-origin animus impaired *his* privilege of soliciting and selling insurance, Defendants' standing argument does not justify summary judgment on Count III. *See Haynes*, 729 N.W.2d at 490 ("[The

public-service provision] prohibits unlawful discrimination against any individual, not just members of the public.").

## IV.

For the reasons given, Defendants' motion for summary judgment (ECF No. 31) is GRANTED IN PART and DENIED IN PART. To the extent that Count III asserts that Michigan Farm Bureau discriminated against members of the public who wanted to buy insurance from Michigan Farm Bureau, Defendants' motion is granted. Defendants' motion is otherwise denied.

SO ORDERED.

Dated: November 8, 2021

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE